# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTONIO B. RAINEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 07506 |
| | ) | |
| CITY OF CHICAGO, Municipal Corporation | ) | Judge Rebecca R. Pallmeyer |
| And Body Politic, OFFICER A. ROBINSON | ) | |
| #729, OFFICER A. WEINER #728, OFFICER | ) | |
| DAVID G. BARNES #5631, OFFICER | ) | |
| JOSEPH PULIA #6311, OFFICER JERRY | ) | |
| DOSKOCZ #6573, OFFICER NICKOLAS | ) | |
| VAMVLAS #11045, JACOB EDINGER, | ) | |
| #10865, SAM DELAURENTIS #745, JUAN | ) | |
| GUTIERREZ #706, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On August 8, 2010, Plaintiff Antonio Rainey was arrested outside of a Chicago bar for reckless and disorderly conduct and for resisting arrest. Rainey filed suit against the City of Chicago, five Chicago Police Department ("CPD") officers, and four University of Illinois Chicago ("UIC") police officers—Anthony Robinson, Adam Weiner, Sam DeLaurentis, and Juan Gutierrez. He alleges in a 42 U.S.C. § 1983 action that Defendants violated his Fourth Amendment rights by subjecting him to excessive force in the course of his arrest (Count I); committed state law battery (Count II); and conspired to use excessive force and to conceal their unlawful conduct (Count III).[1] The four Defendants who are UIC police officers (hereinafter "Defendants") moved for summary judgment. For the reasons explained below, their motion [88] is granted in part and denied in part. The excessive force and battery claims (Counts I and II) against Robinson and Weiner and the conspiracy claim (Count III) against Gutierrez are dismissed. The motion is otherwise denied.

---

[1] Count IV of Plaintiff's complaint deals only with the City of Chicago, so it is not addressed here. (2d Am. Compl. [61], at 5.)

## FACTUAL BACKGROUND

On the night of August 7, 2010, Rainey joined a group of friends that included Jarvis Wardlow, Patrick Barnes, Jermaine Morris, Charles Parker, Amber Martin, Carlos Anderson, and Kareem Parker at Junior's Bar at 724 West Maxwell Street in Chicago. (Rainey Dep.[2] 31:20-22; Pl.'s Resp. to Defs.' Am. 56.1 [100], hereinafter "Pl.'s Resp.", ¶¶ 8-9.) A "commotion" erupted among patrons at the other end of the bar later that night. (Pl.'s Resp. ¶ 11.) Brandon Riley, the general manager at Junior's, testified at his deposition that patrons were behaving aggressively and "getting in each other's faces" and he saw "a circle forming" among patrons, though there was no fight. (Riley Dep., Ex. G to Pl.'s 56.1 [101-3], at 7:22-24, 8:9-17.) At approximately two in the morning of August 8, 2010, the "door guy" at the bar "flagged down" the two UIC police officers assigned to Maxwell Street that night, Defendants Robinson and Weiner. (Defs.' 56.1 ¶ 18; Pl.'s Resp. ¶ 18.)

It was "standard" for Unit 305, a two-person rapid-response unit of UIC officers, to be assigned to Maxwell Street on weekend nights in order to respond to "large disturbances" from the bars. (Pl.'s Resp. ¶ 19; Robinson Dep.[3] 41:24.) Once he approached the bar, Robinson observed such a "large disturbance" inside Junior's through the window. (Pl.'s Resp. ¶ 19.) Robinson and Weiner entered the bar with UIC Police Sergeant Jason Huertas and directed the crowd to leave in order to diffuse the situation. (Pl.'s Resp. ¶ 20; Defs.' 56.1 ¶ 20.) The officers then called dispatch for help and left the bar. (Pl.'s Resp. ¶¶ 20-21.) Rainey assumed a fight was occurring at the time because he saw a "commotion" at the front door, someone turned the bar lights on, and patrons were "kicked out" of the bar. (Rainey Dep. 44:12-21.) People inside the bar began "spilling

---

[2]     Portions of Rainey's September 29, 2011 deposition are included as Ex. 1 to Defs.' Am. Rule 56.1(a)(3) Statement of Material Facts [88], hereinafter "Defs.' 56.1," and Ex. F to Pl.'s Rule 56.1 Statement of Material Facts [101], hereinafter "Pl.'s 56.1."

[3]     Portions of Robinson's October 4, 2011 deposition are included as Ex. 2 to Defs.' 56.1 [88-2] and Ex. N to Pl.'s 56.1 [101-4].

out onto the street."  (Pl.'s Resp. ¶ 21.)

Rainey testified at his deposition that he exited the bar after the lights were turned on and walked to a parking garage near Junior's at 701 West Maxwell Street.  There he encountered his friends Jermaine Morris and Amber Martin, who had also left the bar.  (Rainey Dep. 46:16-17, 51:16-20.)  On his way to his car in the garage, Rainey also reunited with his friend Patrick Barnes. (*Id.* at 53:16-19.)  What happened next is hotly disputed.

I.     **Rainey's Arrest**

UIC Police Sergeant Huertas testified that he entered the parking garage and observed a group of officers, at least some of whom were Chicago Police Department ("CPD") officers, trying to break up a fight between men who were punching each other.  (Huertas Dep., Ex. 6 to Defs.' 56.1 [88-6], at 13:4-23, 15:14-16.)  Another UIC Sergeant, Defendant Gutierrez, testified that he arrived at the scene after receiving a call for help from Huertas and found 50 to 60 men fighting in the parking garage.  (Gutierrez Dep.[4] 15:5-6.)  Defendants assert that Rainey was directly involved in the brawl.

CPD Officer David Barnes testified that he observed Rainey grab a police officer in the parking garage.  (Barnes Dep., Ex. 7 to Defs.' 56.1 [88-7], at 25:20:23.)  According to Defendant Gutierrez, while other officers were restraining Rainey, Gutierrez approached Rainey and grabbed his arm because Rainey was swinging and kicking wildly at everyone.  Gutierrez testified that Rainey stopped swinging after Gutierrez grabbed his arm, but he continued kicking as Gutierrez and CPD officers pulled him down to the ground.  (Gutierrez Dep. 18:8-19:18, 20:6-24.)

For his part, Rainey asserts that no one in the garage was "engaged in physical fights, though there were loud arguments."  (Rainey Decl., Ex. R to Pl.'s 56.1 [101-5], at ¶ 5.)  He insists

---

[4]     Portions of Gutierrez's October 26, 2011 deposition are included as Ex. 4 to Defs.' 56.1 [88-4] and Ex. P to Pl.'s 56.1 [101-4].

that he never "fought with the police, swung at or kicked at anyone." (Rainey Decl. ¶ 6.) According to Rainey, a plain-clothes police officer grabbed his friend Patrick Barnes while Rainey and Patrick Barnes were speaking in the parking garage. (Rainey Dep. 54:13-55:5.) Then another officer whom Rainey could not identify pulled Rainey to the ground by grabbing his left arm, twisting it, and lifting it so Rainey fell on his arm and chest. (*Id.* at 56:16-58:23.)

Plaintiff's friend Charles Parker testified that he was near Plaintiff before Plaintiff's encounter with the police officers, and he saw an officer grab Rainey's arm, spin him in a circle, and knock him down. (C. Parker Dep., Ex. I to Pl.'s 56.1 [101-3], at 35:1-14.) Plaintiff's friend Jermaine Morris similarly testified that he was seven to ten feet from Plaintiff when he saw a group of officers approach Plaintiff and "slam" him to the ground. (Morris Dep., Ex. J to Pl.'s 56.1 [101-3], at 36:5-15.) Charles Parker further testified that once Rainey was on the ground, more than ten officers approached Rainey and an ugly "melee" ensued. (C. Parker Dep. 38:12-39:1.) According to Charles Parker, many officers kicked Plaintiff in the face multiple times. An officer also approached Charles Parker as he watched and cautioned, "You don't want none of this. Back the fuck up . . . go home." (C. Parker Dep. 39:4-9.) Rainey's friend Kareem Parker testified that he was a few steps ahead of Rainey at the time of the incident and saw four or five officers kicking and punching Rainey while he was on the ground. (K. Parker Dep., Ex. L to Pl.'s 56.1 [101-4], at 35:3-24, 38:3-24.) Another friend, Carlos Anderson, testified that he saw a group of six to eight officers grab Rainey and throw him to the ground. Anderson also testified that a uniformed CPD officer holding an assault rifle told him to leave the area, which he did. (Anderson Dep., Ex. M to Pl.'s 56.1 [101-4], 28:2-23.)

Rainey alleges that someone kicked him in his left eye after he hit the ground. (Rainey Dep. 59:12-15.) He asserts that he tried to protect himself by covering his face, and that prevented him from seeing his attackers as they continued kicking and hitting his eye, hand, neck, and back.

4

(Rainey Dep. 60:14-61:5, 66:19-24; Rainey Decl. ¶ 3.)  Rainey testified that he was later diagnosed by an ophthalmologist with a facial fracture due to the trauma to his left eye, an injury described as a "blowout." (Rainey Dep. 127:3-17.)  Rainey acknowledges that he failed to comply with a police officer's order to "[g]ive" the officer his arm while he was on the ground, but maintains that he was unable to do so because he was using his right arm to protect his face from the attack. (Defs.' 56.1 ¶ 17; Rainey Dep. 118:12-17.)  In Plaintiff's version of events, officers "always had control of [his] left arm" from when he was grabbed until he was handcuffed.  (Rainey Decl. ¶ 3.) He alleges that all four Defendants participated in the deprivation of his constitutional rights and committed battery against him through the use of excessive force during his arrest.

CPD Officer David Barnes testified that he worked with other officers to pull Rainey's arms out from under his chest when Rainey was lying face down on the ground.  (Barnes Dep. 28:23-24.) Officer Barnes repeatedly ordered Rainey to "[g]ive me your hands."  (Barnes Dep. 29:23-24.) When Rainey refused, Barnes "hit [Rainey] a couple [of] times in the side" and then took out his taser, put it to Rainey's back, and pulled the trigger.  (Barnes Dep. 30:3-11.)  UIC Officer Stephanie Kriegermeier testified that Rainey resisted arrest by not giving up his hands and was then "dry-stunned"[5] with a taser by a plain-clothes officer.  (Kriegermeier Dep. 19:20-20:20.)

According to Barnes, the taser did not fire the first time he pulled the trigger.  When he fired it a second time, it stung Rainey, causing him to remove his arm from under his chest.  Barnes then pulled Rainey's arms behind his back and another officer handcuffed him.  (Barnes Dep. 30:12-17.) Barnes testified that he removed the cartridge from the taser to "dry-stun" Rainey because the area around Rainey was too crowded to safely deploy the prongs on the taser.  (Barnes Dep. 30:6-11.)

Kriegermeier testified that the only UIC officer she recognized at the scene was Gutierrez,

---

[5]     Dry-stunning with a taser is holding the taser directly against someone's body rather than shooting out prongs on wires to stun someone with the taser.  (Kriegermeier Dep., Ex. Q to Pl.'s 56.1 [101-4], at 20:1-5.)

and she assumed the rest of the officers involved were CPD officers. (Defs.' 56.1 ¶ 57.) According to Kriegermeier, Defendant Gutierrez arrived at the location where Barnes had just "dry-stunned" Plaintiff and held Plaintiff's legs for a short period. (Kriegermeier Dep. 21:3-24.) Gutierrez also testified that he briefly held Plaintiff as Plaintiff resisted. According to Gutierrez, while he was briefly restraining Plaintiff, one of Plaintiff's friends, Jermaine Morris, grabbed Gutierrez by the vest and yanked him backwards, forcing him to release Plaintiff. (Gutierrez Dep. 22:3-22.) UIC Sergeant Huertas used his taser on Morris, and Morris released Gutierrez, who then assisted with the arrest of Morris for resisting an officer. (Gutierrez Dep. 23:4-19; Morris Misdemeanor Complaint, Ex. A to Pl.'s 56.1 [101-2].) Gutierrez and Huertas handcuffed Morris and walked him to a UIC police van. (Gutierrez Dep. 26:8). In Jermaine Morris's account, it was the police officers who attacked Morris after he observed them taking Plaintiff to the ground, not the other way around. (Morris Dep. 36:12-15.)

Officers turned Rainey over onto his back after they handcuffed him. Rainey testified he could not see anything during that time because his face was bloody and his eyes were closed. Rainey estimates that approximately five minutes passed from the time he first observed his friend Patrick Barnes being grabbed by an officer until he was handcuffed. (Pl.'s Resp. ¶ 14.) He was then brought to the UIC police van.

Defendant DeLaurentis, another UIC Police Department officer, arrived at the scene outside Junior's and engaged in foot chases and crowd control during the time that Rainey was arrested in the parking garage, according to Defendants. (Defs.' 56.1 ¶¶ 38-42.) At some point, DeLaurentis entered the garage and observed CPD officers attempting to arrest a large male who was face down on the ground who may or may not have been Plaintiff. (DeLaurentis Dep., Ex. H to Pl.'s 56.1 [101-3], at 42:3-10.) DeLaurentis testified that he did not see the face of the person on the ground and could not identify the person's race. (*Id.*)

6

## II.     The Handcuff Switch

Defendants deny Plaintiff's assertion that UIC officers Robinson and Weiner were present when Rainey was arrested in the parking garage. According to Defendants, Robinson and Weiner remained stationed at the UIC police van to guard it during the period when Rainey was arrested in the parking garage. (Defs.' 56.1 ¶ 21.) Robinson testified that he did not personally witness Rainey fighting in the garage or Rainey's arrest there, and he did not recall who brought Rainey to the van. (Robinson Dep. 38:9-20; 66:17-22.) According to Robinson, he first encountered Plaintiff when other officers brought Plaintiff to the van. Robinson testified that he attempted to switch Rainey's handcuffs at the van, but Rainey pulled away and twisted his body, resisting Robinson's attempt to put him back into handcuffs. (Robinson Dep. 66:5-12.) Weiner testified that he did not witness Rainey's conduct or treatment prior to his arrival at the van, but he did witness Rainey trying to break free when the handcuffs were switched at the van. (Weiner Dep.[6] 48:2-6; 50:2.) Rainey denies that he tried to resist in any way at the police van. (Rainey Decl. ¶ 4.)

## III.    Reports and Complaints Filed About the Events

Rainey disputes Defendants' assertion that Robinson and Weiner were at the van when he was arrested, and alleges they were involved in the excessive force used against him. As evidence, he relies on police reports and misdemeanor complaints prepared by UIC police officers that describe his arrest as if Weiner and Robinson were personally involved. (Pl.'s 56.1 ¶ 19.) The version of events recorded in the reports and complaints differs from both Defendants' and Plaintiff's current versions of events in key ways.

### A.     Police Reports

Robinson prepared three police reports concerning Rainey—two for the UIC Police

---

[6]     Portions of Weiner's October 4, 2011 deposition are included at Ex. 3 to Defs.' 56.1 [88-3] and Ex. O to Pl.'s 56.1 [101-4].

Department and a third for the Chicago Police Department. (CPD Incident Report, Ex. N to Pl.'s 56.1 [101-4], hereinafter "CPD Incident Report", at 52-56; UIC Police Dept. Incident Reports, Ex. 23 to Defs.' 56.1 [88-23].) Plaintiff contends that the reports are evidence that Robinson and Weiner were involved in the excessive force used against him in the parking garage. The UIC police reports that Robinson prepared identify Robinson and Weiner as "Reporting Officer[s]." (UIC Police Dept. Incident Reports.) The CPD report that Robinson prepared identifies him as "1st Arresting Officer" and "Attesting Officer," and identifies Weiner as "2nd Arresting Officer." (CPD Incident Report at 54; Pl.'s 56.1 ¶¶ 18, 21.) Defendants assert that these titles are stock language on a pre-printed form and are not intended to convey that the officers who prepared the form personally witnessed all the events in the report. (Defs.' 56.1 Resp. to Pl.'s 56.1 Statement of Material Facts [104] ¶ 21.) Weiner nevertheless testified that an "attesting officer" is one who swears under the penalty of perjury that the report is accurate. (Weiner Dep. 46:4-7.) Though Robinson is identified in the CPD report as the "attesting officer," he asserts that he was not present when Rainey was arrested and does not recall which officer actually arrested Rainey. Instead, he explained, he "obtained the information necessary to complete the reports by speaking with the parties involved." (Defs.' 56.1 ¶ 25; Robinson Dep. 66:17-22.)

According to Robinson, UIC officers assigned to Maxwell Street customarily handle arrests and write the police reports for all the incidents that occur at the bars on Maxwell Street each Friday and Saturday night. (Robinson Dep. 41:2-19.) Robinson testified at his deposition that he completed the police reports about Rainey that night according to the unit's general practice. Defendants assert that Robinson spoke with CPD officers about the incident, some of whose names and star numbers he may not have listed in the report. (Robinson's Police Dept. Incident Reports; Defs.' 56.1 ¶ 25.) According to Defendants, it is typical within the UIC police department for the officer or officers who take the arrestee into custody to complete the report.

Plaintiff also highlights language in Robinson's CPD report recounting that Rainey "was taken into custody without incident" after he was dry-stunned. (CPD Incident Report at 53; Robinson Dep. 86:10-17.) Rainey was nevertheless charged with "Resisting a Police Officer" in a misdemeanor complaint form prepared and signed by Robinson, which stated that Rainey "refused to obey verbal commands and twisted his arms and body in an effort to defeat the arrest."[7] (Rainey Misdemeanor Compl. for Resisting Arrest, Ex. 24 to Defs.' 56.1 [88-24].) Robinson testified that he charged Rainey with resisting arrest because Rainey attempted to twist away when Robinson was switching Rainey's handcuffs, not because of anything that happened while Robinson was waiting at the van. (Robinson Dep. 86:18-87:9.) Robinson admitted, however, that he made no mention of Rainey's resisting arrest during the handcuff switch in any of his police reports. (Robinson Dep. 87:7-90:13.) Robinson called his failure to mention Rainey's supposed resistance during the handcuff switch in any police report a "general oversight." (*Id.* at 90:15.)

### B. Misdemeanor Complaints

After the bar crowd dispersed and Rainey had been taken into custody, UIC Sergeant Huertas directed DeLaurentis to return to Junior's to get misdemeanor complaints signed. (DeLaurentis Dep. at 28:18-30:24.) DeLaurentis met with Brandon Riley, the general manager of Junior's. (Pl.'s 56.1 ¶¶ 1,3.) Riley was at Junior's before the police arrived and remained there after all the patrons left. (Riley Dep. 13:22-24; Pl.'s 56.1 ¶¶ 1,2.) DeLaurentis told Riley that police "had people in custody, [and] we needed a Complaint signed for disorderly and reckless conduct." (DeLaurentis Dep. 31:3-5.) DeLaurentis then gave Riley several complaints to sign. At his deposition, DeLaurentis testified that he did not recall whether the complaints were blank when he gave them to Riley, but admitted that he did not witness the events at Junior's and that Riley did

---

[7] UIC Sergeant Gutierrez signed and swore to a misdemeanor complaint charging Jermaine Morris with "Resisting a Peace Officer" using identical language to that used by Robinson in charging Rainey. (Morris Resisting Misdemeanor Complaint, Ex A. to Pl.'s 56.1 [101-2].)

not read the complaints when he signed them. (DeLaurentis Dep. 38:17-40:8.)

Riley had previously signed complaints at the request of officers twice before. (Riley Dep. 32:3-33:5.) Riley signed all the complaints DeLaurentis gave him concerning this incident, including complaints against Rainey for reckless conduct and for disorderly conduct. (Pl.'s 56.1 ¶ 3; Reckless Conduct Misdemeanor Complaints, Ex. C to Pl.'s 56.1; Disorderly Conduct Misdemeanor Complaints, Ex. B to Pl.'s 56.1.) Riley recalled at his deposition that the complaint forms may have been blank when he signed them. (Riley Dep. 34:13-16.)

Defendant Robinson prepared the reckless conduct complaint against Rainey, which states that Rainey "was fighting in the middle of the street thereby disturbing the peace of Junior's Sports lounge patrons and disrupting the flow of traffic in the 700 block of West Maxwell." (Reckless Conduct Misdemeanor Complaints at UIC00007; Robinson Dep. 68:15-24.) Though different officers prepared the five complaints Riley signed–charging Rainey, Morris, Patrick Barnes, and two other individuals with reckless conduct–the language in the five complaints is nearly identical. (Reckless Conduct Misdemeanor Complaints.) Robinson did not personally witness Rainey fighting in the street; did not speak to Riley, Junior's manager; and does not recall who told him that Rainey was fighting in the street. (Robinson Dep. 69:12-23.) For his part, Riley testified that he could not identify the people who had been arguing inside Junior's, does not know who Rainey is, and in fact never saw anyone fighting. (Riley Dep. 7:22-8:17, 33:7-11, 37:9-11.)

In addition to the five reckless conduct complaints, Riley also signed five disorderly conduct complaints against the same five individuals, including Rainey. (Disorderly Conduct Misdemeanor Complaints.) The disorderly conduct complaints, too, are worded identically, each asserting that the charged individual "knowingly and intentionally shouted and yelled threats to Brandon Riley . . . in such an unreasonable manner as to alarm and disturb Brandon Riley [sic] Junior's Sports Lounge patrons thereby provoking a breach of peace." (*Id.*) DeLaurentis filled out the disorderly conduct complaints for three of the five individuals charged, not including Rainey, though he admits

that he did not witness the events they described. (DeLaurentis Dep. 36:1-17.) Riley admitted that he does not know who Rainey is, even though the disorderly conduct complaint Riley signed charges Rainey with threatening Riley. (Riley Dep. 7:22-8:17, 33:7-11, 37:9-11.)

## DISCUSSION

Summary judgment is granted if there is no genuine dispute of material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court draws all reasonable inferences in favor of Rainey, the non-moving party. *Fitzgerald v. Santoro*, No. 12-1487, ___ F.3d ___, 2013 WL 452446 (7th Cir. Feb. 7, 2013) (quoting *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772 (7th Cir. 2012)). In reviewing the evidence, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000) (citations omitted).

## I.     Excessive Force and Battery (Count I & II)

For a successful claim under 42 U.S.C. § 1983, the Plaintiff must show that he was (1) deprived of his constitutional rights (2) under "color of state law." *Kramer v. Vill. of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004). Defendants admit they acted under color of state law. When viewed in the light most favorable to Rainey, the facts also indicate that Rainey was arrested by someone using excessive force in violation of his constitutional rights. The only remaining issue in dispute is therefore whether the four Defendants were among those officers who participated in the alleged deprivation of Plaintiff's constitutional rights.[8]

Defendants are liable for depriving Plaintiff of his rights if they either used excessive force themselves or failed "to take reasonable steps to attempt to stop the use of excessive force used by [their] fellow officers." *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012); *see also*

---

[8]     Defendants contend that Plaintiff does not adequately allege Defendant DeLaurentis used excessive force against him. (Defs.' Reply Mem. of Law in Support of Defs.' Mot. for Summ. J. [106], hereinafter "Defs.' Reply Mem.", at 4.) The court rejects this contention.

*Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) ("Police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights . . . but fail to do so have been held liable."). A police officer is liable for failing to prevent other law enforcement officers from inflicting excessive force against a citizen "if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen ha[d] been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The Seventh Circuit has explained that a "realistic opportunity to intervene" may exist when an officer could have called for help, or when an officer could have cautioned the officer using excessive force to stop. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285). A defendant police officer may be held liable for failure to prevent excessive force even when the plaintiff cannot identify exactly which officers used excessive force on him. *Sanchez*, 700 F.3d at 926.[9] A claim of failure to intervene almost always implicates questions of fact for the jury. *Abdullahi*, 423 F.3d at 774.

Defendants argue that Plaintiff cannot establish that any of them were involved in arresting Rainey in the parking lot, and contend that they are therefore not liable under §1983. Defendants note that Plaintiff has also sued the City of Chicago and five CPD officers, and allege that numerous other CPD officers were also on the scene. Defendants maintain that Plaintiff's allegations do not adequately distinguish between Chicago Officers and the UIC police officers, and note that witnesses who testified in the record did not name any of the UIC Police Officers as among those who allegedly used excessive force against Rainey. In summary, Defendants argue that Plaintiff's allegations against unidentified officers are insufficient for a section 1983 claim

---

[9] Illinois law also permits a plaintiff to hold a municipality liable for "battery . . . committed by its police officers in the course of their duties" even when the plaintiff cannot identify the officers. *Sanchez*, 700 F.3d at 926-27.

12

against UIC officers Weiner, Robinson, Gutierrez, or DeLaurentis. (Defs.' Reply Mem. at 4-6.) The court examines the evidence against each Defendant in turn.

### A.    Officers Robinson and Weiner

Defendants assert that Robinson and Weiner were not present when excessive force was allegedly used against Plaintiff because they were guarding the police van at the direction of Sergeant Huertas. Defendants argue that Robinson and Weiner therefore could not have been involved in the alleged deprivation of Rainey's constitutional rights. In response, Plaintiff contends that a jury could reasonably reject Robinson's and Weiner's claim that they were at the police van during the incident and instead conclude that they were directly involved in Rainey's arrest based on the police reports.

No admissible evidence directly contradicts Robinson and Weiner's testimony that they were at the police van when the alleged excessive force occurred. The only evidence Plaintiff cites for his contention that Robinson and Weiner were involved in his arrest are the police reports they prepared and signed as "arresting" or "reporting" officers. Neither Plaintiff's nor Defendants' witnesses place Robinson and Weiner in the parking garage at any time prior to or during the arrest of Rainey. Without any evidence in the record that Robinson or Weiner were in the parking garage, there is no genuine issue of material fact on the excessive force and battery claims against Robinson and Weiner.

Plaintiff is understandably troubled by the police reports. Robinson and Weiner completed those reports following what they assert is UIC's customary practice for officers assigned to Unit 305. As the court understands this practice, it has little merit. Robinson and Weiner admit that they did not personally carry out those arrests or observe the events recorded in the reports. Though it is well-recognized that an officer may rely on the observations of other officers in determining probable cause for an arrest, *Spiegel v. Cortese*, 196 F.3d 717, 726-27 (7th Cir. 1999)

(officer who reasonably relied on detective's probable cause determination was entitled to qualified immunity), there is no support for the notion that one officer may swear to facts observed only by another officer. As Weiner himself explained, an attesting officer is one who swears under the penalty of perjury that the report is accurate—yet Robinson and Weiner admit they lacked personal knowledge of the circumstances set forth in their reports. Weiner's and Robinson's reports therefore falsely claim first-hand knowledge of the circumstances surrounding Rainey's arrest.

However improper and disappointing this practice is, however, its impropriety does not translate into evidence that Weiner and Robinson actually participated in the arrest. Robinson and Weiner have testified they did not, and neither Plaintiff nor any of his witnesses provide any evidence in the record to the contrary. Without evidence of Weiner's or Robinson's participation in the arrest, Plaintiff has not created a dispute of fact concerning their involvement in the use of excessive force against him. Summary judgment is granted as to Robinson and Weiner for Counts I and II.

### B. Sergeant Gutierrez

Defendants admit that Gutierrez was near Rainey during the arrest in the parking garage, but assert he only grabbed Rainey briefly and did not use excessive force. According to Defendants, Gutierrez was only momentarily present before being attacked by Jermaine Morris, and he never used excessive force while holding Rainey. (Defs.' Reply Mem. at 7.) It is undisputed, however, that Gutierrez engaged in physical contact with Rainey. Gutierrez's testimony establishes that he participated in Rainey's arrest and was directly involved in taking him down to the ground. Moreover, Kriegermeier witnessed Gutierrez grab Rainey's legs after he was taken to the ground and shot with a taser. Rainey asserts that he was kicked in the eye and punched as soon as he was on the ground. Viewing the facts in the light most favorable to Rainey,

it is reasonable to conclude that Gutierrez could have participated in the excessive force used against him.

To be liable under section 1983, an individual must have caused or participated in a constitutional violation. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009). Gutierrez physically held Rainey during a period when Rainey alleges excessive force was used against him. Although Plaintiff's witnesses could not identify which officers performed certain acts, it is undisputed that Gutierrez restrained Rainey at some point, however briefly, during the arrest. The motion for summary judgment is denied as to Gutierrez for Counts I and II.

### C.      Officer DeLaurentis

Plaintiff claims that DeLaurentis failed to intervene to stop the excessive force used against him by other officers. (Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. [99], hereinafter "Pl.'s Mem.", at 7.) Defendants argue in reply that Plaintiff fails to satisfy the *Yang* test for failure to intervene as to Officer DeLaurentis. *Yang,* 37 F.3d at 285. According to Defendants, there is no evidence that any of the UIC officers knew any police officers used excessive force against Rainey or that UIC officers were aware Rainey was unjustifiably arrested. (Defs.' Reply Mem. at 8-10.) Defendants assert that DeLaurentis was only briefly present in the garage while CPD officers attempted to arrest Rainey. Defendants argue that since DeLaurentis did not witness the force other officers were using, he had no duty to intervene.

The evidence Defendants rely on to establish that DeLaurentis did not witness excessive force being used against Rainey, however, is contradicted by the testimony of Plaintiff's friends. Carlos Anderson testified that he saw officers grab Rainey and throw him to the ground. Jermaine Morris testified that he saw Rainey slammed to the ground by a group of officers while he was walking toward the parking garage. Amber Martin witnessed Rainey injured on the ground. Charles Parker, who testified that he was standing beside Rainey before the incident, saw officers

pull Rainey down and dry-stun him with a taser.

According to Rainey, his encounter with the police in the parking garage lasted approximately four to five minutes, which is ample time for officers on the scene to intervene. There is no evidence that any officer who was present in the parking garage, including DeLaurentis, did intervene to prevent excessive force from being used against Rainey. Instead, the record suggests that officers at the scene actively prevented bystanders from approaching Rainey through threats such as: "You don't want none of this." (C. Parker Dep. 39:7-9.)

In asking for summary judgment, Defendants invite the court to make credibility determinations. The court declines the invitation. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (no credibility determinations at summary judgment stage). If bystanders were able to observe the alleged attack on Rainey, then DeLaurentis could also have been aware of the alleged excessive force. DeLaurentis himself acknowledges witnessing CPD officers attempting to arrest someone who was face down on the ground in the parking garage. A jury could reasonably determine that he was in a position to act to stop the alleged abuse of Rainey. Summary judgment is denied as to DeLaurentis for Counts I and II.

## II.    Conspiracy (Count III)

For a successful conspiracy claim under section 1983, the plaintiff must establish (1) an agreement or meeting of the minds between two or more of the defendants to violate his civil rights, and (2) an overt act in furtherance of the conspiracy which results in a violation of a federal constitutional right. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). Evidence of an agreement is required to support a conspiracy allegation. *Kelley v. Myler*, 149 F.3d 641, 649 (7th Cir. 1998) (quoting *McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir.1989)). In this case, Plaintiff claims that Robinson, Weiner, and Gutierrez "worked in concert . . . when inflicting

excessive force" against him. He also claims that all four Defendants engaged in a "conspiracy to cover-up and protect themselves from liability for their illegal actions." (2d Am. Compl. at 4.)

Plaintiff's conspiracy claim rests primarily on the police reports and misdemeanor complaints Defendants prepared. Specifically, Plaintiff cites the preparation of police reports by officers lacking first-hand knowledge about the incident; discrepancies between police reports and misdemeanor complaints; DeLaurentis's procurement of Riley's signature for allegedly blank complaints; and the identical use of language in complaints for various arrestees. (*Id.*) He argues that the misleading, incomplete, and inaccurate information in the reports suggests a conspiracy among Defendants to conceal the identities of officers who used excessive force against him.

Defendants argue that there is no evidence that they reached an agreement to violate Rainey's constitutional rights. An agreement to violate a plaintiff's civil rights may be inferred from circumstantial evidence "only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 305 (7th Cir. 2011) (quoting *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999)). Defendants urge that the preparation of the police reports and misdemeanor complaints is not sufficient evidence of an agreement to further a conspiracy. In support of their argument, Defendants cite *Kunz v. City of Chicago*, 234 F. Supp. 2d 820, 823 (N.D. Ill. 2002). In *Kunz*, a plaintiff claimed that the office responsible for investigating police misconduct by the CPD, the Office of Professional Standards ("OPS"), concealed evidence that police used force to coerce a confession. *Id.* at 822-23. The district court held that absent evidence that OPS had suppressed witness statements in his favor, plaintiff's conspiracy claim did not survive summary judgment. *Id*. at 823.

While Plaintiff here does not have direct evidence of conspiracy, such a finding can be inferred from circumstantial evidence. *Sow*, 636 F.3d at 305 (quoting *Hernandez*, 197 F.3d at 262). Unlike in *Kunz*, where the plaintiff offered little more than conjecture, in this case Rainey offers

17

ample circumstantial evidence of police misconduct. For example, Defendants procured Riley's signature on complaints for fighting inside of Junior's even though Riley testified that he did not witness an actual fight, could not identify the people who had been arguing inside the bar, and does not know who Rainey is. (Riley Dep. 7:22-8:17, 33:7-11, 37:9-11.) DeLaurentis's procurement of Riley's signature and Robinson and Weiner's roles in preparing the complaints and police reports against Rainey may reasonably be interpreted as circumstantial evidence of a conspiracy.

Defendants also cite *Kelly v. Chambers*, No. 07 C 1005, 2009 WL 765267 (N.D. Ill. Mar. 23, 2009) as evidence that speculative evidence is insufficient to support a conspiracy claim. (Defs.' Reply Mem. at 12.) In *Kelly*, the plaintiff, a village trustee, had proposed eliminating the local police department. The plaintiff alleged that local police officers who would have lost their jobs under her proposal retaliated against her by creating a police report that described her interference in a traffic stop of her son two months before the report was written. *Kelly*, 2009 WL 765267 at *1-2. The plaintiff cited the timing of the report and suspicious changes in deposition testimony as evidence of conspiracy, but the district court concluded her evidence was largely speculation. *Id*. at *4-5.

Again, here, in contrast to *Kelly*, Plaintiff offers more than mere discrepancies in testimony and speculation about motive. Rainey presents evidence that officers at the scene of the incident created erroneous misdemeanor complaints to justify his arrest and conceal the identity of the actual arresting officers who used excessive force. Riley, who supposedly witnessed the events and who signed the complaints, testified that he does not even know who Plaintiff is. Defendants admit that they wrote and signed reports about events when they had no first-hand knowledge, and that DeLaurentis may have procured signatures on blank misdemeanor reports. Further, the suspicious absence of any mention of Rainey's resistance at the police van from all of the police reports that Robinson and Weiner prepared supports Plaintiff's conspiracy claim.

Defendants argue that the discrepancies present in the police reports and misdemeanor complaints are due to simple police error, not an intentional cover-up. When viewing the facts in

18

the light most favorable to Plaintiff, however, a jury could infer that DeLaurentis's procurement of signatures on blank misdemeanor complaints and Defendants' willingness to swear to false charges against Rainey after he was seriously injured reflect a conspiracy to conceal Defendants' use of excessive force. Plaintiff has shown there is a genuine issue of material fact about whether Defendants' misleading, inaccurate, and incomplete reports amount to a conspiracy to conceal excessive force used against him.

Last, Defendants contend that Plaintiff's conspiracy claim under section 1983 should fail because the alleged cover-up did not prevent him from pursuing relief in court. (Defs.' Reply Mem. at 15.) Defendants are correct that conspiracy is not an independent basis of liability in section 1983 actions. *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (when jury exonerated the defendants of substantive constitutional violations, no relief on a conspiracy claim under section 1983). When a state actor tries to impede an individual's access to courts, however, such as when a police officer conceals facts about a crime, a plaintiff may be deprived of his constitutional right to seek judicial relief for an injury. *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) ("when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged").

Deplorable conduct by police officers is not alone enough under section 1983 for an actionable deprivation of a plaintiff's right to seek judicial relief. *Vasquez*, 60 F.3d at 329 ("Not every act of deception in connection with a judicial proceeding gives rise to [a constitutional action]") (citations omitted). In *Vasquez*, for example, the Seventh Circuit held there was no constitutional violation when police misconduct delayed the disclosure of key facts for six months. The court in *Vasquez* noted that the delay did not prevent the plaintiff from pursuing a tort action in state court, and that the value of the claim was not reduced by the police misconduct. *Id.* at 329. Similarly, in *Cefalu*, the Seventh Circuit held that there was no basis for a conspiracy claim against police officers who allegedly concealed violations of arrestees' rights because the facts needed to

19

seek relief were already known to the arrestees. The Seventh Circuit held that since the arrestees were aware of the circumstances of their arrest, the officers' concealment of facts about the arrest did not cause any injury. 211 F.3d at 423-24.

Plaintiff's allegations are distinguishable from *Vasquez* and *Cefalu* because the absence of accurate information in the police reports and complaints about who arrested Rainey and why undoubtedly hindered Plaintiff in his attempts to hold Defendants responsible for the excessive force he alleges they used against him. Though Plaintiff was a witness to Defendants' alleged violations, his case differs from *Cefalu*: Plaintiff testified that he covered his face to protect it during an attack, and was therefore unable to identify which officers were harming him and the extent of their involvement. He did not know all the facts necessary to bring his claim, and could not obtain them without deposing each of the dozens of officers present at the scene. The hindrance to Rainey here also exceeds the six-month delay in *Vasquez*. The court denies Defendants' motion for summary judgment on Plaintiff's conspiracy claim generally. The question of which of the individual Defendants is liable on that claim is examined below.

### A.    Officer DeLaurentis

DeLaurentis brought the possibly blank misdemeanor complaint forms to Riley and told him that "we [the police] need a complaint signed for disorderly and reckless conduct." (DeLaurentis Dep. 31:1-23.) Defendants contend that asking witnesses to sign forms was typical for Unit 305, and Riley recalled having signed complaints at the request of police in the past. Defendants argue that DeLaurentis's procurement of Riley's voluntary signature is inadequate evidence of a conspiracy. (Defs.' Reply Mem. at 14-15.) When viewed in the light most favorable to Plaintiff, however, this evidence supports his claim. The completed forms charged Rainey with disorderly conduct and reckless conduct for threatening Riley inside of Junior's and disturbing patrons outside of the bar. Yet there is no evidence that Rainey actually did threaten Riley or that Riley witnessed

20

Rainey causing any disturbance. The version of events in the misdemeanor complaints for reckless and disorderly conduct therefore makes little sense.

Significantly, if Plaintiff had been in a bar fight as the misdemeanor complaints alleged, Defendants could plausibly argue that Plaintiff's injuries did not result from excessive force during his arrest. Thus, Defendants arguably had a motive for obtaining Riley's signature on inaccurate charges. DeLaurentis's comments to Riley that there were people in custody and "we [the police] need a complaint" signed are also suspicious, particularly in light of the fact that Riley did not know who Rainey was at his deposition. DeLaurentis's use of the pronoun "we" in his comments to Riley could suggest a meeting of the minds with co-conspirators. (DeLaurentis Dep. 31:3-5.) The fact that Rainey voluntarily pleaded guilty to the charge of resisting arrest does not change these facts. (Rainey Dep. 115:14-17.) Rainey declared that he did not resist during the handcuff switch, so his decision to plead guilty to resisting arrest was presumably not based on alleged resistance during that time. (Rainey Decl. ¶ 4.) Rainey's conspiracy allegations against DeLaurentis are more than pure speculation.

Defendants also assert that DeLaurentis procured Riley's signature on the complaints because he was ordered to do so by his superior, Sergeant Huertas. In Defendants' view, Rainey's failure to name Huertas as a conspirator undermines his claim. (Defs.' Am. Mem. of Law in Supp. of Their Mot. for Summ. J. [88], hereinafter "Defs.' Mem.", at 21.) The court disagrees. DeLaurentis's alleged procurement of signatures on blank forms is enough evidence to suggest DeLaurentis knowingly furthered the scheme to cover-up Rainey's arrest, whether or not he did so at Huertas's direction. *See McCann v. Mangialardi*, 337 F.3d 782, 789-90 (7th Cir. 2003) (citing *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (to be liable as a conspirator, one must understand the general objectives of the scheme and agree to explicitly or implicitly further them, but need not know who the other conspirators are)); *Sanchez*, 700 F.3d at 926 (police officer may be liable for failure to prevent excessive force even when the plaintiff cannot identify exactly which

21

officers used excessive force on him). Summary judgment on the conspiracy claim against DeLaurentis is denied.

### B. Officer Robinson

Discrepancies between the complaints, the police reports, and current testimony are enough to permit a reasonable jury to conclude that Robinson conspired to conceal excessive force used against Rainey as well. Robinson prepared the misdemeanor complaint charging Rainey for reckless conduct for "fighting in the middle of the street" outside Junior's. (Reckless Conduct Misdemeanor Complaints at UIC00007; Robinson Dep. 68:15-24.) The complaint may have been blank when Riley signed it, and there is no evidence that Riley witnessed Rainey engage in a fight outside of Junior's. Even if, as Defendants assert, there was a situation in Junior's significant enough to require police attention, Rainey's mere presence at a bar where a fight occurred is not enough to justify a reckless conduct charge without other evidence. Robinson's preparation of a complaint against Rainey which appears to have no evidentiary support could be understood by a reasonable jury as evidence of conspiracy.

Plaintiff further alleges that the complaint against him for resisting arrest prepared by Robinson was meant to conceal the identity of the officials who arrested Plaintiff in the parking garage. Robinson prepared and signed the misdemeanor complaint charging Rainey with resisting a police officer for "twist[ing] his arms and body in an effort to defeat . . . arrest." (Rainey Misdemeanor Compl. for Resisting Arrest.) Robinson also prepared several police reports about Rainey, none of which mention any resistance from Rainey during the handcuff switch. Defendants assert that Rainey was charged with resisting arrest because of his actions during the handcuff switch at the police van, and note that he pleaded guilty to resisting arrest. Rainey did plead guilty to resisting arrest, but denies that he resisted at the van. Rainey asserts that he resisted only when he refused to give up his hands when ordered to do so by officers in the parking garage. The fact

that Rainey was brought to the van in handcuffs at all indicates that an incident that officers believed warranted arrest had already occurred. If, as Rainey alleges, he did not resist at the van, a reasonable jury could conclude that Robinson fabricated his claims about the handcuff switch in order to prevent the arresting officers who brought Rainey to the van from being identified.

### C.    Officer Weiner

Defendants argue that there is insufficient evidence that Officer Weiner conspired against Rainey. Weiner's situation presents a closer question. Unlike Robinson, Weiner did not prepare misdemeanor complaints against Rainey. Weiner did, however, prepare a reckless conduct complaint against another individual, Melvin Rhames, that was identical to the reckless conduct complaint Robinson prepared against Rainey. Like Robinson, Weiner did not speak to Riley and has no recollection about the source for the allegations in the reckless conduct complaint. (Weiner Dep. 43:20-45:9.) Weiner acted in the same way toward Melvin Rhames as Robinson did toward Rainey. A reasonable jury could find that Weiner participated in a conspiracy to cover-up excessive force with his Unit 305 partner Robinson. The court denies Defendants' summary judgment motion on Count III as to Weiner.[10]

### D.    Sergeant Gutierrez

Gutierrez prepared a misdemeanor complaint against Jermaine Morris for "Resisting a Peace Officer" using language identical to the resisting-arrest complaint prepared by Robinson

---

[10]    Plaintiff also alleges that Robinson and Weiner prepared police reports to justify their harsh treatment of Rainey and to hide the identities of the officers involved. As evidence, Plaintiff notes that the police reports state falsely that Robinson and Weiner were directly involved in the arrest, and fail to identify the officers who were in fact on the scene. Unlike the misdemeanor complaints, however, there is no evidence of impropriety in the preparation of the police reports, which appears to have been consistent with the practices and policies of the UIC Police Department. Robinson and Weiner were on the Unit 305 beat that customarily handles all Maxwell Street arrests. Their preparation of police reports according to standard procedure is not indicative of two minds working to deprive Rainey of his constitutional rights. Though the officers' normal reporting procedure may well lack merit, following standard procedure does not suggest even circumstantially that Robinson and Weiner conspired to deprive Rainey of his constitutional rights.

against Rainey. (Morris Misdemeanor Compl. for Resisting Arrest, Ex. A to Pl.'s 56.1, at UIC00049.) The mere fact that Gutierrez used language identical to the language Robinson used in his own questionable complaint against Rainey is not enough to suggest that Gutierrez's actions were an attempt to conceal a violation of Rainey's rights, however. Unlike the complaint Weiner prepared, the complaint Gutierrez prepared did not rely on the imputed recollection or the signature of Riley. Summary judgment is granted for Gutierrez as to Count III.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted for Defendants Robinson and Weiner as to Counts I and II. The motion is granted for Defendant Gutierrez as to Count III. Defendant DeLaurentis's motion is denied as to all counts.

ENTER:

Dated: March 11, 2013

_____
REBECCA R. PALLMEYER
United States District Judge